Filed 9/23/20  P. v. Coleman CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LOUIS RAY COLEMAN,<br><br>    Defendant and Appellant. | A154631<br><br>(Contra Costa County<br>Super. Ct. No. 5-170819-7) |

Defendant Louis Ray Coleman appeals a judgment sentencing him to prison for life without the possibility of parole based on his conviction on 25 criminal counts related to his kidnap and sexual assault of two victims. He asserts numerous arguments challenging, among other things, the denial of his motion to represent himself at trial, the court's instructions to the jury and the sufficiency of the evidence to support his convictions on certain counts. We find no prejudicial error and shall affirm the judgment.

**Factual and Procedural Background**

Defendant was charged by amended information with committing 25 criminal offenses against two victims. With respect to Jane Doe 1, defendant was charged as follows: human trafficking of a minor for a sex act (count 1; Pen. Code, § 236.1, subd. (c)(2));[1] aggravated sexual assault/rape of a child

---

[1] All statutory references are to the Penal Code unless otherwise specified.

1

(counts 2, 4, 13; § 269, subd. (a)(1)); forcible lewd act upon a child (counts 3, 7, 8, 9, 10, 11, 15, 16; § 288, subd. (b)(1)); aggravated sexual assault/oral copulation of a child (counts 5, 14; § 269, subd. (a)(4)); aggravated sexual assault/penetration of a child (count 6; § 269, subd. (a)(5)); kidnapping to commit sex offenses (count 12; § 209, subd. (b)(1)); and unlawful driving or taking of a vehicle (count 17; Veh. Code, § 10851, subd. (a)). The eight counts of forcible lewd acts upon a child included "One Strike" allegations under section 667.61.

With respect to Jane Doe 2, defendant was charged as follows: human trafficking to commit another crime (count 18; § 236.1, subd. (b)); forcible rape (counts 19, 25; § 261, subd. (a)(2)); forcible sodomy (count 21; § 286, subd. (c)(2)(A)); forcible oral copulation (counts 22, 23, 24, § 288a, subd. (c)(2)(A)); and kidnapping to commit rape and oral copulation (count 20, § 209, subd. (b)(1)). Personal firearm use enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and "One Strike" allegations (§ 667.61) were alleged as to many of the offenses. A prior Vehicle Code section 10851, subdivision (a) conviction was alleged under section 666.5 and two section 667.5 prior convictions were also alleged.

At trial, Jane Doe 1 testified that she was 12 years old when she met defendant near the Richmond BART station after asking him for directions. Defendant led her to an abandoned house and offered her methamphetamine. She went with him behind the house because she thought he was going to help her, but once behind the house she felt like she could not leave because she was afraid defendant would hurt her. She explained that she smoked the methamphetamine defendant offered because she was starting to feel like something bad might happen and was thinking that the drug might change the way she was feeling. Over the course of three days, defendant repeatedly

gave her drugs and sexually and physically assaulted her. She escaped when defendant left her unattended in the back of a van at the Greyhound bus station. During the course of the offenses, defendant told her that he wanted her to be a prostitute for him.

Jane Doe 2 testified that she met defendant near the Richmond BART station when she asked for directions to a nearby bank. Defendant led her to an abandoned house and over a period of three days tricked her into smoking methamphetamine, moved her from place to place against her will, and repeatedly sexually and physically assaulted her. She was able to escape when defendant took her to a store near the Richmond BART station. Doe 2 testified that during the course of the offenses, defendant told a man they ran into that he was training Doe 2 to be a prostitute.

Two additional witnesses testified regarding prior uncharged sexual assaults perpetrated against them by defendant. The first victim testified that in June 1995, when she was 12 years old, defendant used a gun to force her into a car. He brought her to an apartment where he held her against her will and sexually assaulted her. When she escaped, she called the police, told them the perpetrator's name and later identified defendant. She testified that defendant was prosecuted for the crimes he committed against her. The second victim testified that in 2000, when she was 13 years old, she met defendant at the McArthur BART station after running away from home. For five years, defendant held her against her will, sexually and physically abused her, and forced her to work as a prostitute.

Defendant denied engaging in any criminal conduct. He testified that he met Jane Doe 1 at the Richmond BART station when she asked for directions to Los Angeles. They ended up hanging out together for three days before he left her at the West Oakland Greyhound station. They used

3

methamphetamine together and engaged in consensual sex. She told him she was 18, but later said that she was turning 17. He testified that after meeting Jane Doe 2 at the BART station they also hung out together for a few days, used methamphetamine together and engaged in consensual sex. He denied physically or sexually assaulting her. With respect to the first victim of the uncharged conduct, defendant claimed that he believed she was at least 22 years old when they engaged in consensual sex. After his arrest, he learned that she was actually 12 years old, so he pled guilty to sexual battery. With respect to the second victim of the uncharged conduct, defendant denied that he acted as her pimp and claimed that any sexual contact was consensual.

The jury found defendant guilty of each of the charged offenses and found the firearm and "One Strike" allegations true. After finding the prior conviction enhancement allegations true, the court sentenced defendant to multiple consecutive terms of life without possible parole (LWOP) plus additional terms totaling 301 years 9 months to life in prison.

Defendant timely filed a notice of appeal.

## Discussion

### 1. Defendant's Faretta Motion for Self-representation

" 'A criminal defendant has a right to represent himself at trial under the Sixth Amendment to the United States Constitution. [Citations.] A trial court must grant a defendant's request for self-representation if three conditions are met. First, the defendant must be mentally competent, and must make his request knowingly and intelligently, having been apprised of the dangers of self-representation. [Citations.] Second, he must make his request unequivocally. [Citations.] Third, he must make his request within a reasonable time before trial.' " (*People v. Stanley* (2006) 39 Cal.4th 913, 931–932. citing *Faretta v. California* (1975) 422 U.S. 806, 834-835 (*Faretta*).)

4

The erroneous denial of a *Faretta* motion is reversible per se. (*People v. Carlisle* (2001) 86 Cal.App.4th 1382, 1390.) We review de novo whether the defendant's invocation of the right to self-representation and waiver of the right to counsel was knowing and voluntary. (*People v. Best* (2020) 49 Cal.App.5th 747, 756.) A ruling denying a *Faretta* motion as untimely is reviewed for abuse of discretion. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 426.)

The initial complaint against defendant was filed on June 15, 2016. Following numerous pretrial proceedings at all of which defendant was represented by counsel, on September 26, 2017, the day before the jury trial was set to begin, he first informed the court that he wanted to represent himself. The court advised defendant that it was about to rule on a number of motions filed by defendant's attorney and that the jury trial was going to start the following day. The court questioned whether defendant would be able to represent himself on the motions and prepare for trial given the timing and legal complexity of some of the motions. Ultimately, the court said, "today, like right now, we're going to do some motions that were filed by your attorney. And I think if you listen to what he has filed and is arguing, you will see he's taking care of business as he's supposed to. I don't think you will have any issue like that. Okay?" The defendant responded "Uh-huh" and then "Okay. Okay." The motions were ruled on that day and jury selection began the next day.[2]

Defendant contends his convictions should be reversed because "the court violated *Faretta* when it failed to (1) comply with *Faretta* procedural

_____

[2] As defendant notes, the day after ruling on the motions, defense counsel requested a continuance based on recently produced discovery. The court denied the continuance and commenced with jury selection. Defendant has not challenged the denial of the continuance.

5

'admonishment' requirements, (2) exceeded its authority in attempting to persuade defendant to not exercise his right to self-representation, and (3) used improper factors to deny defendant his right to self-representation." The Attorney general contends the court properly denied defendant's motion as untimely.

Although both parties' arguments are based on the premise that the court denied defendant's motion, the record does not reflect a final ruling. Defendant made an unequivocal request, but then acquiesced to the court's suggestion that he listen to the proceedings on the pending pre-trial motions before making any decision regarding self-representation. While the court might have denied the motion as untimely, it does not appear that it did. (*People v. Lynch* (2010) 50 Cal.4th 693, 722 [Although the courts have not "fixed any definitive time before trial at which a motion for self-representation is considered untimely," the California Supreme Court has held on numerous occasions that "*Faretta* motions made on the eve of trial are untimely."]; *People v. Valdez* (2004) 32 Cal.4th 73, 102 [*Faretta* request made "moments before jury selection" untimely]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110-1111 [*Faretta* request made on the date scheduled for trial untimely].) The matter was not raised again nor did defendant press the court for a final ruling after the pre-trial motions were decided.

The right to self-representation can be waived or abandoned after its invocation. The standard for waiving or abandoning the right to self-representation is "substantially less stringent than it is for waiving the right to counsel." (*People v. Fedalizo* (2016) 246 Cal.App.4th 98, 104.) The right to self-representation may be waived or abandoned expressly or impliedly through conduct that is inconsistent with the assertion of the right. (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 183; accord, *People v. Trujeque*

(2015) 61 Cal.4th 227, 262–263 [the right to self-representation, " 'once asserted, may be waived or abandoned,' " and such "abandonment may be inferred from a defendant's conduct"].) Moreover, abandonment may be found where a trial court does not rule on a *Faretta* motion and the defendant does not raise the issue again. (*People v. Dunkle* (2005) 36 Cal.4th 861, 909, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see also *People v. Skaggs* (1996) 44 Cal.App.4th 1, 7-8; *People v. Kenner* (1990) 223 Cal.App.3d 56, 69.)

Contrary to defendant's argument, nothing in the record suggests the court induced or coerced defendant to abandon his right to self-representation. Rather, the court properly advised defendant of the pitfalls of self-representation and emphasized the seriousness of the case. The court explained, "We have several motions on today that your attorney has filed that we are going to proceed on today. You are not familiar with the law in those motions. Those are not motions you wrote, nor motions that you understand, but they are very important. So shouldn't you just stick with the lawyer who has been representing you for a year who knows your case inside and out?" The court noted that defendant had been represented by the same attorney for over a year and had not had any complaints about him. The court added, "It's a serious case. Like I said, I've been spending all morning working on the motions and researching the law because I don't know. I have to research the law as they are quoting it to me and seeing if it's correct. And that doesn't make sense for you to say, okay, I will just pick up the whole show and start it tomorrow on my own when you don't understand these motions." Finally, in response to defendant's request for additional time to prepare, the court stated: "I can't do that. Not only is it a no-time waiver, but it's now been sent to the court for trial. That means everything's been put in

7

motion. The [district attorney] has subpoenaed their witnesses. The defense attorney has a list of what witnesses he might actually bring in to testify. [¶] The machine has started. Everything is ready to go. And that means 140 jurors and a lot of witnesses and a lot of people are involved in a train that has just left the station. [¶] I want you to understand that I will not give you a continuance to prepare the case because you can't possibly prepare a case this complicated in a short amount of time. Certainly not by tomorrow." Throughout the conversation, defendant stated, "I understand" and "right" before ultimately agreeing to proceed with the pretrial motions. Under these circumstances, defendant abandoned his request to represent himself by not reasserting his request after the pretrial rulings.

### 2. Prosecutorial Error

During rebuttal argument the prosecutor argued: "What are the odds that four different women of different ages from different parts of their lives from different places all come in here and told you what that man did to them. I challenge the defense to explain a reasonable explanation for that." Defense counsel's objection to the prosecutor's "improper argument" was overruled.[3] Thereafter, the prosecutor continued, "I challenge each and every one of you to come up with a reasonable explanation for that piece of circumstantial evidence. I'll tell you what, there is not a reasonable

_____

[3] The ground for defendant's objection is not entirely clear. (See *People v. Hill* (1998) 17 Cal.4th 800, 820, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' "].) Any potential forfeiture notwithstanding, we will address the merits of defendant's claim given his appended ineffective assistance of counsel argument. (*People v. McCullough* (2013) 56 Cal.4th 589, 593; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.)

explanation for that . . . because there is no reasonable explanation for why all four of these women got up here and told you what they did about the defendant. The only reasonable explanation is that the defendant is guilty." The prosecutor also asked, "How come every single little girl that that man rapes supposedly says she's 18 to him? Why? What are the odds of that?"

Defendant contends that the prosecutor's rebuttal argument improperly "relied on statistical probability theory to dilute the People's burden of proof, in violation of the principles announced in *People v. Collins* (1968) 68 Cal.2d 319 and *People v. Centeno* (2014) 60 Cal.4th 659 and the 'prosecutorial error' was 'reasonably likely' to misled the jury "about the applicable standard of proof and how the jury should approach its task."

In *People v. Collins*, *supra*, 68 Cal.2d at pages 325, 327-331, the court held that improperly admitted testimony by a math professor regarding the statistical probability of a random couple possessing the characteristics of the codefendants was likely to have interfered with the jury's weighing of the evidence because the manner in which the prosecution used the improper testimony "distracted the jury from its proper and requisite function of weighing the evidence on the issue of guilt, encouraged the jurors to rely upon an engaging but logically irrelevant expert demonstration, foreclosed the possibility of an effective defense by an attorney apparently unschooled in mathematical refinements, and placed the jurors and defense counsel at a disadvantage in sifting relevant fact from inapplicable theory." (*Id*. p. 327.)

In *People v. Centeno*, *supra*, 60 Cal.4th at page 672, the court held that "it is error for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof." (Italics omitted.) The court explained, "Here, the prosecutor's argument began with what the jury could consider: reasonably possible interpretations to be drawn from the

9

evidence. While this is an acceptable explanation of the jury's starting point, it is only the beginning. . . . The standard of proof is a measure of the jury's level of confidence. It is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt. [Citation.] The prosecutor, however, left the jury with the impression that so long as her interpretation of the evidence was reasonable, the People had met their burden." (*Ibid.*; see also *id.* at p. 673 [The prosecutor "repeatedly suggested that the jury could find defendant guilty based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden." (Italics omitted.)].)

Tying these cases together, defendant argues that the prosecutor in this case "used mathematical probability odds doctrine to obtain a conviction without attempting to use a mathematician to support the doctrine or explaining the doctrine. The jurors were the mathematicians and they were to calculate the odds. Like the prosecutors in *Collins* and *Centeno*, the prosecutor's argument was designed to dilute and circumvent the prosecution's burden of proof. [¶] . . . [¶] Under the prosecutor's 'odds' argument, the actual evidence did not have to be evaluated or credibility determined because the 'odds' created by four independent victims with independent backgrounds was sufficient circumstantial evidence of guilt." In his rebuttal brief, defendant emphasizes that the argument diluted "the prosecution's burden of proof by substituting statistical mathematical certainty for evidence." We disagree.

The suggestion that the prosecutor's argument asked the jury to engage in statistical calculations is overreach. The prosecutor was clearly using the word "odds" in a colloquial sense. More importantly, the prosecutor did not argue that her burden was satisfied because the four victims gave such

10

similar testimony. The prosecutor identified circumstantial evidence—the fact that the four women did not know each other—and argued that the only reasonable inference to draw from that circumstantial evidence was that the witnesses were telling the truth. Then the prosecutor argued, "if you believe everything [Jane Doe 1 and Jane Doe 2] said, defendant is guilty as long as you believe them beyond a reasonable doubt[.] [U]nder the law, that's all the evidence you need to convict the defendant. [¶] But in this case, we have a lot more than that . . . . We have so much corroboration here." The prosecutor then proceeded to discuss how the testimony of the victims of the uncharged offenses corroborated the testimony of Doe 1 and Doe 2 in this case. There is no reason to conclude that the jury understood the prosecutor's argument to permit a conviction based simply on the odds or the fact that the testimony of the uncharged witness corroborated that of the victims' in this case, without finding the victims' testimony true beyond a reasonable doubt. There was no misconduct and no error.

### 3. Instructional Error: Sex Offense "Propensity" Instruction

Evidence Code section 1101, subdivision (a) " ' "expressly prohibits the use of an uncharged offense if the *only* theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense." ' " (*People v. Clark* (2016) 63 Cal.4th 522, 588.) Evidence Code section 1108, subdivision (a), however, provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

11

The trial court instructed the jury with CALCRIM No. 1191 as to the uncharged sex offense evidence admitted under Evidence Code section 1108 as follows: "The People presented evidence that the defendant committed other sex crimes not charged in this case. . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the charged sex offenses in this case. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged sex offenses. The People must still prove each charge and allegation beyond a reasonable doubt."

Defendant contends that the instruction misstates California law and violates his right to due process. He argues that uncharged offenses are circumstantial evidence of defendant's guilt and thus, they must be proven

12

beyond a reasonable doubt.[4] Defendant's argument is contrary to well established California and federal Supreme Court authority.

The United States Supreme Court has made clear that the evidence supporting a permissive presumption is properly subject to the preponderance standard "[a]s long as it is clear that the presumption is not the sole and sufficient basis for a finding of guilt." (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 167 ["There is no more reason to require a permissive statutory presumption to meet a reasonable-doubt standard before it may be permitted to play any part in a trial than there is to require that degree of probative force for other relevant evidence before it may be admitted."]; see also *People v. McCall* (2004) 32 Cal.4th 175, 183, fn. 5 [explaining permissive inferences].) CALCRIM No. 1191 creates a permissive inference. (*People v. Schnabel* (2007) 150 Cal.App.4th 83, 87.) CALCRIM No. 1191 expressly instructs that the jury, "If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged sex offenses. The People must still prove each charge and allegation beyond a reasonable doubt." In *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016, the California Supreme Court upheld the constitutionality of the predecessor instruction to CALCRIM No. 1191 against a claim that it improperly lessened the prosecutor's burden of proof. The instruction considered in *Reliford* is

---

[4] To be clear, we are not addressing the burden of proof applicable when other *charged* offenses are used as propensity evidence to prove other charged offenses. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1167-1168 [implicitly recognized that charged offenses offered as propensity evidence must be proven beyond a reasonable doubt]; *People v. Cruz* (2016) 2 Cal.App.5th 1178, 1186 [holding that charged offenses offered as propensity evidence must be proven beyond a reasonable doubt]; CALCRIM No. 1191B.)

similar in all material respects to CALCRIM No. 1191, which was given here, in its explanation of the law on permissive inferences and the burden of proof. We are in no position to reconsider the Supreme Court's holding in *Reliford*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) There was no error in the court's instruction using CALCRIM No. 1191.

### 4. Instructional Error: Counts 12 and 20 (Aggravated Kidnapping) and Count 17 (Unlawful Taking a Motor Vehicle)

As set forth above, CALCRIM No. 1191 instructed the jury that it could consider the uncharged offenses in deciding whether "the defendant was likely to commit and did commit the *charged sex offenses* in this case." Defendant contends that his conviction on counts 12, 17, and 20 should be reversed because they are not sex offenses and it is reasonably likely that the jury improperly used " 'propensity' evidence to convict on the charged non-sex crimes of aggravated kidnapping and unlawful taking a motor vehicle." We disagree.

Initially, we agree with the Attorney General that the two aggravated kidnapping charges qualified as sex offenses under Evidence Code section 1108. Kidnapping to commit rape is not expressly identified as a sexual offense under Evidence Code section 1108, subdivision (d)(1)(A).[5] However, the crime encompasses all the elements of an attempted rape and thus qualifies as a sex offense under section 1108, subdivision (d)(1)(F), which makes the attempt to engage in conduct described in subdivision (d)(1)(A) a

---

[5] Evidence Code section 1108, subdivision (d)(1) defines the term "sexual offense" to include among other things "(A) Any conduct proscribed by subdivision (b) or (c) of Section 236.1, Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former Section 288a of, the Penal Code."

14

sexual offense. An attempt occurs when there is a specific intent to commit a crime and a direct but ineffectual act done towards its commission. (§ 21a.) Kidnapping for the purpose of rape requires that the defendant commit the kidnapping with the specific intent to rape the victim. This requirement is derived from the statutory definition of the offense as "kidnap[ping] or carr[ying] away . . . to commit . . . rape." (§ 209, subd. (b)(1).) A kidnapping for the purpose of rape is not a mere act of preparation. It demonstrates that the perpetrator is putting his plan into action and it is necessarily an attempt to commit rape. Kidnapping for the purpose of rape is, therefore, a sexual offense within the meaning of section 1108. (See also *People v. McCurdy* (2014) 59 Cal.4th 1063, 1099-1100 [evidence of defendant's uncharged incestuous conduct toward his younger sister admissible under section 1108 at trial for capital murder and kidnapping with the purpose to commit a lewd act on a child under 14 years old]; *People v. Daveggio & Michaud* (2018) 4 Cal.5th 790, 822 [evidence of uncharged sex-offenses was admissible under section 1108 because it was relevant in capital murder case to whether defendant kidnapped the victim for the purpose of rape]; *People v. Robertson* (2012) 208 Cal.App.4th 965, 970 [evidence of prior aggravated kidnapping admissible under section 1108 to prove charges of aggravated kidnapping.].)

With respect to count 17, there is no reasonable likelihood the jury would believe that unlawful taking of a vehicle constituted a sex offense. (*People v. O'Malley* (2016) 62 Cal.4th 944, 991 [" 'The relevant inquiry [when instructional error is claimed] is whether, "in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice." ' "]; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 [" ' " '[W]e must assume that jurors are intelligent people

and capable of understanding and correlating all jury instructions which are given.' " ' "].)

### 5. Sufficiency of the Evidence: Kidnapping

Defendant was convicted of two counts of aggravated kidnapping under section 209, one count for each of his victims (counts 12 and 20). The jury also found true the special circumstance under section 667.61, subdivision (d)(2) that defendant kidnapped the victims of the charged sexual offenses (counts 3, 7-11, 15-16, 19, 21-25). Defendant contends that the evidence is insufficient to support either these convictions or the findings on the special allegations.

Under section 209, subdivision (b)(1), "[a]ny person who kidnaps or carries away any individual to commit . . . rape [or other enumerated offenses] shall be punished by imprisonment in the state prison for life with the possibility of parole." To prove a defendant guilty of kidnapping, " 'the prosecution must establish that (1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person, or made the other person move a substantial distance; and (3) the other person did not consent to the movement.' " (*People v. Perkins* (2016) 5 Cal.App.5th 454, 464-465.) To prove aggravated kidnapping under section 209, the prosecutor must also prove that "the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above

16

that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).)[6]

Section 667.61, subdivision (a) provides that any person who is convicted of an enumerated sex offense, "under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life." As relevant here, subdivision (d)(2) triggers sentencing under the One Strike law where "defendant kidnapped the victim of the present offense and the movement of the victim substantially increased the risk of harm to the victim over and above that level of risk necessarily inherent in the underlying offense." Subdivision (e)(1) triggers sentencing under the One Strike law where "defendant kidnapped the victim of the present offense in violation of Section 207, 209, or 209.5." Neither subdivision (d)(2) or (e)(1) requires that the defendant kidnap the victim for the purpose of committing the sexual offense or that the sexual offense is committed in the course of the kidnapping. (*People v. Kelly* (2016)

---

[6] The jury was instructed pursuant to CALCRIM No. 1203 as follows: "The defendant is charged in Count 12 and 20 with kidnapping for the purpose of rape, oral copulation, sodomy and sexual penetration in violation of Penal Code section 209(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit rape, oral copulation, sodomy or sexual penetration; [¶] 2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear; [¶] 3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] 4. The other person was moved or made to move a distance beyond that merely incidental to the commission of a rape, oral copulation, sodomy or sexual penetration; [¶] 5. When that movement began, the defendant already intended to commit rape, oral copulation, sodomy, or sexual penetration; [¶] 6. The other person did not consent to the movement; [¶] AND [¶] 7. The defendant did not actually and reasonably believe that the other person consented to the movement."

17

245 Cal.App.4th 1119, 1128; *People v. Luna* (2012) 209 Cal.App.4th 460, 466; *People v. Jones* (1997) 58 Cal.App.4th 693, 717.)[7]

In closing argument, the prosecutor differentiated between the one-strike allegations and the substantive charges of aggravated kidnapping. The prosecutor argued that after the victims were taken behind the abandoned house and smoked the methamphetamine, and then no longer felt free to leave, they were kidnapped for purposes of the special circumstance allegation. In contrast, the aggravated kidnapping charges required consideration of "specific facts." As discussed below, the prosecutor carved out specific time periods within the kidnapping to support the aggravated kidnapping charges. (See *People v. Kelly, supra,* 245 Cal.App.4th at p. 1127 [Where defendant is charged with one act of kidnapping but evidence supports two acts of kidnapping, "the prosecutor must elect the specific act relied upon to prove the charge to the jury, or the court must instruct the jury that it must unanimously agree that the defendant committed the same specific criminal act."].)

*A. Jane Doe 1*

Evidence was presented that Doe 1 willingly accompanied defendant to the backyard of the abandoned house where she smoked methamphetamine with him. After smoking the methamphetamine, she was "really high" and

---

[7] Consistent with the above, the jury was instructed pursuant to CALCRIM No. 1215 as follows: "The defendant is charged with special allegations of kidnapping . . . . [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant took, held, or detained another person by using force or by instilling reasonable fear; [¶] 2. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] AND [¶] 3. The other person did not consent to the movement; [¶] AND [¶] 4. The defendant did not actually and reasonably believe that the other person consented to the movement."

18

her head was "spinning." She was asleep or unconscious when defendant began raping her. Thereafter, she stayed with defendant for two days and did not attempt to run away because she was afraid he would hurt her. During that period, she and the defendant traveled around the area, moving from a Jeep to a stolen van. Defendant sexually and physically assaulted her in both the Jeep and the van.

The prosecutor argued that the aggravated kidnapping charge was based on the specific movement of Doe 1 from the Jeep to the van. The prosecutor argued, "So, the movement from the Jeep to the van, specifically he took her straight to the van, and he raped her. He moved her against her will."

Defendant contends there is insufficient evidence that defendant's motive and intent was to commit rape when he moved Doe 1 from the Jeep to the van. He argues that the only evidence in the record suggests he moved her to "escape detection and third party intervention." He relies on Doe's statements to a police officer at the Children's Interview Center, which were admitted into evidence, that defendant moved her from the Jeep to the van because he thought somebody saw him hitting her. He argues that the delay between the movement and the subsequent rape demonstrates the absence of a specific intent to rape at the time of the asportation. Defendant's arguments, however, ignore substantial evidence that supports the prosecution's theory. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139 [If the circumstances reasonably justify the findings of the trier of fact as to each element of the offense, an opinion of the reviewing court that the circumstances might also lead to a contrary finding does not warrant reversal.]; *People v. Mack* (1992) 11 Cal.App.4th 1466, 1468 [In evaluating

19

the sufficiency of the evidence, "we must resolve any conflicts in evidence or credibility and draw all reasonable inferences in favor of the verdict."].)

Doe 1 testified that prior to moving her to the van, defendant had already raped her twice. After stealing the van and forcing her into it, he drove a relatively short distance to a different neighborhood before he raped her again. She testified that the rape occurred "soon after" defendant took the van. While defendant may have been seeking to avoid detection by moving the victim to the van, the evidence reasonably supports the jury's finding that defendant also intended to again rape the victim after he moved her to the van. The jury reasonably could have concluded that he could not complete the rape in the Jeep or in the van at that location if he had been observed by witnesses. There is no doubt that the movement decreased the likelihood of detection and enhanced defendant's opportunity to commit the subsequent rape. Accordingly, substantial evidence supports defendant's conviction on count 12.

*B. Jane Doe 2*

The evidence established that Doe 2 accompanied defendant to the backyard of the abandoned house. She testified that while she agreed to smoke marijuana with defendant she did not know the marijuana was laced with methamphetamine. She had never used methamphetamine and it rendered her light-headed, dizzy, confused, panicky and it was hard for her to control her body. When she sat on a mattress, defendant raped her. Thereafter, he threatened her with a gun and forced her to accompany him to two other locations. At one point, while standing outside a house, she asked to use a bathroom and defendant took her into the bathroom where he sexually assaulted her again. The prosecutor argued that the aggravated kidnapping occurred "when the defendant took [Jane Doe 2] into the house,

and he took her into the bathroom, and he raped her . . . . That movement substantially increased her risk of danger, and it decreased his risk of detection because he took her inside the house and took her straight to the bathroom, he closed the door, and he locked that door."

Defendant contends his kidnapping conviction must be reversed because "when defendant accompanied Doe 2 from the front of the house to the house's bathroom there was no . . . forcible movement [or] use of force or fear." Defendant argues, "Doe 2 needed to go to the bathroom and that motivated her movement. Defendant simply accompanied her . . . . Doe 2 never testified that defendant did any forcible act or made any threat or comment which caused her to go to the front door so that she could use the bathroom."

Kidnapping requires that the defendant overcome the victim's free will by use of force or fear. (*People v. Hill* (2000) 23 Cal.4th 853, 856.) The force, however, need not be physical. (*People v. Alcala* (1984) 36 Cal.3d 604, 622, superseded by statute on other grounds as stated in *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Movement is forcible " ' "where it is accomplished through the giving of orders [that] the victim feels compelled to obey because he or she fears harm or injury from the accused and such apprehension is not unreasonable under the circumstances." ' " (*Alcala*, at p. 622.)

The evidence establishes that defendant used a gun to kidnap Doe 2 after raping her in the backyard of the abandoned house. Later, when Doe 2 asked permission to go to the bathroom, he used that opportunity to commit further sexual offenses. He directed her away from a group of people standing outside the house to the isolated bathroom. He did not permit her to use the toilet, however. Instead, he immediately closed the door and began assaulting her. Doe 2 testified that she stayed with defendant and followed his

21

directions after leaving the backyard because she was afraid of him. Defendant chose the bathroom to which he brought her. He did not allow her to leave to find her own bathroom. The jury was instructed pursuant to CALCRIM No. 1215 that defendant was not guilty of kidnapping if the victim consented to go with the defendant and that the victim "consented if she (1) freely and voluntarily agreed to go with or be moved by the defendant, (2) was aware of the movement, and (3) had sufficient maturity and understanding to choose to go with the defendant." Defendant's continued exercise of control over the victim's movement defeats any implication that her movement to that bathroom was voluntary. (See *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 [victim's testimony that he did not want defendant to enter his apartment but was "scared" and "just following [defendant's] directions" supported jury's finding that movement was involuntary.].) Accordingly, substantial evidence supports defendant's conviction on count 20.

### C. Kidnapping-Related "One Strike" Allegations

The jury found true each of the kidnaping-related "one-strike" allegations (§ 667.61, subd. (d)(2)) that were attached to many of the charged sex offenses (counts 3, 7-11, 15-16, 19, 21-25). With respect to this special circumstance allegation, the prosecutor argued: "This special allegation is charged under nearly every single count. It's a conduct allegation. You don't need to worry specifically about each and every charge, but just know that the defendant had these individuals kidnapped the entire time from the moment that they went behind the abandoned house. [¶] The enhancements that—or the allegations that are charged here, the elements are that the defendant took, held, or detained another person using force or fear. He used that force or fear and moved the other person or made them move a

22

substantial distance, and that that person did not consent to the movement, and that the defendant did not actually and reasonably believe the person consented. [¶] Now, here's the important thing to note about this, Ladies and Gentlemen, because you may ask yourself, well, initially the two girls walked with the defendant consensually, but consent can be withdrawn. If a person . . . agreed to go with defendant, that consent ended when they changed their mind and no longer freely agreed to go with or be moved by the defendant. [¶] And that's exactly what happened here, Ladies and Gentlemen. At the point in time when (Jane Doe 2) and (Jane Doe 1) got back behind that abandoned house, and the defendant began drugging them, at that point their consent had been withdrawn. They no longer felt free to leave. [¶] Here are some things to consider when determining whether or not an individual is kidnapped for purposes of this allegation. Consider whether or not the victim had sufficient maturity and understanding to choose to go with the defendant. (Jane Doe 1) was alone. It was dark. She was with a stranger, a man who was much older and much bigger than she was. She also did not know where she was and was unfamiliar [with] the area. [¶] But again, Ladies and Gentlemen, both victims were kidnapped the entire time that they were with defendant from the moment they went behind the abandoned house and no longer felt free to leave. For (Jane Doe 1), the moment the defendant began touching her in a sexual manner, she was scared and she no long[er] felt free to leave. For (Jane Doe 2), the minute she took a hit of that methamphetamine and felt stranger and that man started touching her, she said she didn't feel like it was herself anymore, and that it was hard for her to have control over her body. [¶] Defendant moved both victims behind that house and by doing that increased the risk of harm to the victims and increased their ability to be detected and seen under that tarp. And from

23

every moment on that the defendant moved those girls, they were kidnapped."

Initially, we reject defendant's argument that the closing argument quoted above prosecutor's argument suggests that the kidnapping commenced when defendant "tricked" the victims into accompanying him into the backyard of the abandoned house. No reasonable jury would reach such a conclusion based on the prosecutor's argument that defendant "moved" the victims behind that house. The court did not, as defendant suggests, err by failing to sua sponte instruct the jury that "asportation by fraud alone does not constitute kidnapping."

Defendant also argues that there is insufficient evidence to support the true findings on the counts 3, 6, and 19 that were alleged to have occurred in the backyard, before any asportation had occurred. We disagree. As discussed above, the special circumstance does not require that the defendant kidnap the victim for the purpose of committing the sexual offense or that the kidnapping commence prior to the sexual offense. In *People v. Kelly*, *supra*, 245 Cal.App.4th at page 1128, the court observed that it "would be absurd to construe the statute to apply only where a kidnapping precedes a sexual offense when the risk of harm to a victim who is sexually assaulted and then kidnapped is no less substantial." (See also *People v. Jones*, *supra*, 58 Cal.App.4th at p. 717 ["the circumstance would apply if the defendant commits the sexual offense, then, as an afterthought, kidnaps the victim"].) Assuming the kidnapping commenced when defendant moved the victims from the backyard of the abandoned building, this movement substantially increased the risk of harm to the victims over and above the level of risk necessarily inherent in the initial sexual assaults because it prevented them from escaping, moved them to locations with which they were not familiar

24

and subjected them to days of continued abuse. Accordingly, substantial evidence supports the jury's true findings on the one-strike allegations. [8]

## 6. Instructional Error: Firearm Use Enhancements

The information alleged and the jury found true that defendant personally used a firearm within the meaning of sections 12022.5, subdivision (a), and 12022.53, subdivision (b) in the commission of several offenses committed against Jane Doe 2.[9] The court instructed the jury pursuant to CALCRIM No. 3146 that if it found defendant guilty on those substantive counts, it must decide whether, for each crime, the People proved that defendant "personally used a firearm during the commission of that crime." The court instructed the jury that someone "personally uses a firearm" if he "[d]isplays the firearm in a menacing manner" and that a firearm is "any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion." The court also gave the following pinpoint instruction over defense objection: "A defendant's own words and conduct in the course of an offense may support a rational factfinder's

---

[8] For this reason, we reject the Attorney General's concession that the special circumstance allegation found true as to count 19 should be reversed because defendant did not kidnap Doe 2 until after the rape had occurred.

[9] Section 12022.5, subdivision (a) reads: "Except as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

Section 12022.53, subdivision (b) reads in relevant part: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years."

determination that he used a firearm." Defendant was sentenced to a total of 40 years in prison for the firearm enhancements.

Defendant contends the court erred in giving the pinpoint instruction. The instruction was derived from *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435-1436, in which the court held that the nature of a weapon as a real firearm, rather than a replica, may be established from circumstantial evidence alone. In that case, the court recognized it was "conceivable" the gun used by defendant was a toy, but concluded that the jury was entitled to rely on defendant's conduct to find that the pistol was real and loaded. "Simply stated, when as here a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm within the meaning of section 12022.53, subdivision (b). In other words, the victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt, as a matter of law, that the gun was a firearm." (*Monjaras* at p. 1437.)

In *People v. Hunter* (2011) 202 Cal.App.4th 261, the court held that an instruction based on *Monjaras* was improper. In *Hunter*, the jury was instructed, " 'When a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. The victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm.' " (*Id*. at p. 267.) The *Hunter* court found the first sentence of the instruction was unduly argumentative (*id*. at p. 275) and that it violated the Fifth Amendment by lightening the prosecution's burden of proving every element beyond a

reasonable doubt (*id*. at p. 276). The court concluded that although the instruction did not direct the jury to find the firearm use enhancement true, it "did highlight this one aspect of the evidence as not necessarily creating a reasonable doubt, thereby permitting the jurors to interpret the instruction as a caution against finding a reasonable doubt on this basis. This impermissibly alleviated the district attorney's need to persuade the trier of fact that the gun used in the robbery was a real one." (*Ibid*.)

The instruction given in this case is distinguishable from that given in *Hunter* and does not suffer from the same defects. The "unduly argumentative" language in the offending instruction in *Hunter* was deleted from the present instruction. The present instruction did not direct the jury to find the firearm use allegation true or inform the jury a " 'victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm,' " as the instruction in *Hunter* did. (*People v. Hunter, supra,* 202 Cal.App.4th at p. 267.) It merely advised that defendant's own words and conduct "*may* support a rational factfinder's determination that he used a firearm." There was no error in giving the pinpoint instruction.

Defendant also contends the court erred by failing to define the phrase "during the commission of" as used in CALCRIM No. 3146.[10] In *People v. Jones* (2001) 25 Cal.4th 98, 108, the court considered the meaning of the phrase "in the commission" as it appears in the firearm enhancement statutes. Analogizing to well-developed law regarding the felony murder rule, the court concluded, "In the case of a weapons-use enhancement, such use

---

[10] Although the statutes use the phrase "in the commission of a felony," the CALCRIM instruction uses the phrase "during the commission of" the specified crime. Defendant notes the discrepancy, but does not suggest there is a meaningful difference between the two as used in this context.

may be deemed to occur 'in the commission of' the offense if it occurred *before, during, or after* the technical completion of the felonious sex act. The operative question is whether the sex offense posed a greater threat of harm—i.e., was more culpable—because the defendant used a deadly weapon to threaten or maintain control over his victim." (*Id.* at pp. 109-110, see also *People v. Wardell* (2008) 162 Cal.App.4th 1484, 1495 [" '[T]he phrase "in the commission of" a felony, as used in section 12022.5, means during and *in furtherance of* the felony.' "].) Assuming that the jury should have been instructed that defendant must use the firearm "during and in furtherance" of the specified crimes, defendant was not prejudiced by the absence of such instruction.

The firearm enhancements were alleged in connection with the rape that occurred in the backyard of the abandoned house, two of the sex offenses that occurred in the bathroom at the subsequent location and an oral copulation count that occurred at a third location. With respect to the rape that occurred in the backyard, Doe 2's testimony was that defendant threatened her with the gun after completion of the rape when she stood and tried to leave the yard. With respect to the sex offenses that occurred in the bathroom at the subsequent location, Doe 2 testified that defendant put a gun to her side before committing the offenses. With respect to the oral copulation count, the victim testified that defendant brandished the gun and waved it in the air during the incident. Thus, there is ample evidence that defendant used the firearm during and in furtherance of the commission of each of these offenses. (See *People v. Jones, supra*, 25 Cal.4th at p. 109 [The "commission" of a sexual offense "does not end with the completion of the sex act, but continues as long as the assailant maintains control over the victim."].)

Contrary to defendant's suggestion, the failure to define the phrase "in the commission of" did not allow the jury to find true the personal use allegations based only on finding that defendant was "armed" with a gun. Defendant was not charged with, nor was the jury instructed regarding the enhancement for being armed with a firearm. (*People v. Majors* (1998) 18 Cal.4th 385, 410 [court does not have sua sponte obligation to instruct on being armed with a firearm as a lesser included enhancement of personally using a firearm].) The jury was instructed that a defendant uses a firearm if he "[d]isplays the firearm in a menacing manner," which is precisely what the evidence showed defendant did in the commission of each of the charged offenses.

There was thus no error in instructing with CALCRIM No. 3146.

### 7. Instructional Error: One Strike Allegation regarding Administration of a Controlled Substance to Jane Doe 1

With respect to three counts involving Jane Doe 1, the information alleged and the jury found true allegations under section 667.61, subdivision (e)(6) that in the commission of the charged offenses defendant "administered a controlled substance to the victim in violation of Penal Code section 12022.75."[11]

Pursuant to CALCRIM No. 3183, the jury was instructed, "If you find the defendant guilty of the crimes charged in Counts 3, 15, and 16 forcible

---

[11] Section 667.61, subdivision (e)(6) provides an alternative sentencing scheme for specified sex offenses if "defendant administered a controlled substance to the victim in the commission of the present offense in violation of Section 12022.75." Section 12022.75 provides a sentence enhancement for "any person who, for the purpose of committing a felony, administers by injection, inhalation, ingestion, or any other means, any controlled substance listed in Section 11054, 11055, 11056, 11057, or 11058 of the Health and Safety Code, against the victim's will by means of force, violence, or fear of immediate and unlawful bodily injury to the victim or another person . . . ."

lewd acts on a child, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant administered a controlled substance to Jane Doe 1 during the commission of those crimes. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation, the People must prove that: [¶] 1. In the commission of forcible lewd acts on a child, in counts 3, 15 and 16, the defendant administered methamphetamine, a controlled substance, to Jane Doe 1; [¶] 2. The defendant administered the methamphetamine, a controlled substance, against that person's will by means of force, violence, or fear of immediate and unlawful bodily injury to that person; [¶] AND [¶] 3. The defendant did so for the purpose of committing forcible lewd acts upon a child. [¶] A person administers a substance *if he applies it directly to the body of another person by injection, or by any other means, or causes the other person to inhale, ingest, or otherwise consume the substance*. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

Defendant contends CALCRIM No. 3183 incorrectly defines "administered." The definition of "administered" in the pattern CALCRIM instruction is drawn from *People v. Mack, supra,* 11 Cal.App.4th at page 1468, in which the court held that "the qualifying phrase 'administered by . . . the accused' requires only that a defendant have instigated or encouraged the ingestion of the resistance-suppressing substance and not—as argued by the defendant—that the resistance-suppressing substance be ingested by means of force or trick." The *Mack* court found that the term "administered" incorporates definitions found in both the Health and Safety

30

Code and in Black's Law Dictionary. (*Id*. at pp. 1479-1468.)[12] Defendant contends that only the Health and Safety Code definition is appropriate to define "administered" for purposes of section 667.61, subdivision (e)(6) because the definition drawn from the Black's Law Dictionary improperly permitted the jury to find the allegations true based on his "furnishing" the drugs, not administering them. We disagree.

First, contrary to defendant's argument, the definition of "administered" in the Health and Safety Code does not require direct application of the substance by defendant to the victim's body. The statutory definition, like the dictionary definition, recognizes that a controlled substance may be administered if it is applied by the patient "at the direction and in the presence of the practitioner."

Moreover, nothing in the instructions permitted the jury to find the enhancement allegations true based on defendant's mere furnishing of the methamphetamine to the victim. The California Uniform Controlled Substances Act defines "furnish" to mean "supply by any means, by sale or otherwise." (Bus. & Prof. Code, § 4026; Health & Saf. Code, § 11016.) The second clause of the court's instruction provides that a person administers a substance if that person "causes the other person to inhale, ingest, or otherwise consume the substance." It is not reasonably likely that the jury

---

[12] Health and Safety Code section 11002, which defines the term for purposes of the Uniform Controlled Substances Act, provides: " 'Administer' means the direct application of a controlled substance, whether by injection, inhalation, ingestion, or any other means, to the body of a patient for his immediate needs or to the body of a research subject by any of the following: [¶] (a) A practitioner or, in his presence, by his authorized agent. [¶] (b) The patient or research subject at the direction and in the presence of the practitioner." Black's Law Dictionary defines "administered" as follows: "To cause or procure a person to take some drug or other substance into his or her system." (Black's Law Dict. (6th ed. 1990) p. 44, col. 2.)

interpreted the instruction to permit a true finding based only on evidence that defendant supplied the methamphetamine.

In any event, Doe 1 testified that defendant put the methamphetamine pipe in her mouth, lit it, and told her to smoke it. He did the same later in the Jeep. Doe also told the police immediately after her escape that defendant forced her to smoke methamphetamine. She said the same thing to the [sexual assault response team] examiner the following day, and to the police interviewer two days after that. There is no basis on which the jury could have reasonably concluded that defendant merely furnished but did not administer the methamphetamine. Any potential instructional error was harmless.

Defendant contends further that CALCRIM No. 3183, as given, improperly required the jury to find that he "administered the methamphetamine, a controlled substance, . . . against that person's will by means of force, violence, or fear of immediate and unlawful bodily injury to that person" and that he "did so for the purpose of committing forcible lewd acts upon a child." Defendant recognizes that "the error may appear to be beneficial to defendant, because it imposed additional elements that were unnecessary to establish a section 667.61, subdivision (e)(6) circumstance finding" but suggests that "any such appearance is misleading and illusory" because the error "distracted from the jury's sole duty to determine whether defendant 'administered' a controlled substance to the victim 'in the commission of the present charged offense.' " The inclusion of additional elements did not prejudice defendant. There is no likelihood the jury was distracted or confused by the instructions given.

Finally, defendant contends that CALCRIM No. 3183 prejudicially failed to define the phrase "during the commission of" as used in

section 667.61, subdivision (e)(6). Defendant relies on the "identical reasons" asserted previously in connection with the firearm use instruction. Defendant argues, "Doe 1 testified that the administration of [methamphetamine] to her occurred on Day 1, in the back yard of the abandoned house and in the Jeep. Further, the touching of her private part occurred on Day 2, after they returned to the Jeep. Doe 1 never testified that defendant administered meth to her during Day 2, either before she . . . and defendant left the Jeep or after she and defendant returned to the Jeep. Nor did she testify that defendant administered meth to her either before or during the touching of her private part."

Defendant misstates the trial testimony. Doe 1 testified that she and defendant smoked methamphetamine multiple times. She could not specify every occurrence but testified that she was under the effects of the drugs throughout her time with defendant. Indeed, when asked to estimate how many separate times they smoked methamphetamine with Doe 1 in the two nights and three days that they were together, defendant confirmed, "It was quite a lot. . . . Basically like all day and all night. Every time she was with me." Accordingly, any conceivable instructional error in this regard was harmless.

### 8. Sentencing Issues

Defendant was sentenced on 25 counts and their related enhancements, aggregating 301 years 9 months to life in prison. Defendant was also sentenced to six consecutive indeterminate terms of life without the possibility of parole (counts 7-12) and two concurrent indeterminate terms of life without the possibility of parole (counts 15, 16). He was also sentenced to two consecutive indeterminate terms of 25 years to life (counts 23, 25), four consecutive indeterminate terms of 25 years to life with 10-year

enhancements (counts 19, 21, 22, 24), one concurrent indeterminate term of 25 years to life (count 3), one consecutive indeterminate term of life with the possibility of parole (count 20) and seven consecutive indeterminate terms of 15 years to life (counts 1, 2, 4-6, 13, 14). Finally, defendant was sentenced to an aggregate consecutive determinative term of six years nine months on counts 17 and 18.[13]

### A. Counts 17 & 18

The parties agree that the court miscalculated defendant's determinative term on counts 17 and 18. They disagree, however, regarding the proper remedy. The court selected the midterm on counts 17 and 18 and ran the terms on the two offenses consecutively. Under section 1170.1, subdivision (a), defendant should have been sentenced to an aggregate determinative term of 19 years calculated as follows: 14 years for the human trafficking conviction (§ 236.1, subd. (b)) plus four years for the associated firearm enhancement (§ 12022.5) plus one-third the midterm, one year, for the vehicle theft (Veh. Code, § 10851, subd. (a)).

Defendant contends that the "unauthorized sentences require an entirely new sentencing hearing because a lawfully imposed [determinative] prison term may affect One Strike sentencing decisions." The Attorney General argues the determinative sentence should simply be modified on appeal and that remand for resentencing is unnecessary because "the terms are separate and independent of each other [citation], and the error is

---

[13] The parties agree that the abstract of judgment does not correctly reflect the court's oral pronouncement of sentence as to counts 3 and 23. The court sentenced defendant on count 3 to a concurrent sentence of 25 years to life in prison. The abstract of judgment incorrectly states that the sentence was consecutive. The court sentenced defendant on count 23 to a consecutive sentence of 25 years to life in prison. The abstract of judgment incorrectly states that the sentence was concurrent. The abstract must be corrected.

mathematical rather than substantive, [so] there is no reason to think one would affect the other." Given the overall length of the sentence imposed by the court, we are confident that adding just over 12 years to defendant's sentence would not prompt the trial court to reduce any other portion of the sentence. The error can be fully corrected without any need for a further hearing in the trial court.

### B. Sections 654 and 209

Section 654, subdivision (a) provides, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "Section 654 bars multiple punishments for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective." (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368, overruled on other ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) " 'Whether a course of criminal conduct is divisible, and therefore, gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the incidents were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Britt* (2004) 32 Cal.4th 944, 951-952.) If, however, a defendant entertains multiple criminal objectives independent of, and not merely incidental to, each other, he or she "may be punished for the independent violations committed in pursuit of each objective even though the violations were part of an otherwise indivisible course of conduct." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) Further, offenses divisible in time, although directed to one objective, may be punished separately. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.) "This is particularly so where the

offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Ultimately, the purpose of section 654 "is to insure that a defendant's punishment will be commensurate with his culpability." (*People v. Perez* (1979) 23 Cal.3d 545, 551.)

"Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

*Jane Doe 1*

Defendant contends his sentences for kidnapping Jane Doe 1 to commit a sex crime (count 12) and vehicle theft (count 17) should be stayed under section 654 because they were part of an indivisible course of conduct with count 13, aggravated sexual assault of Jane Doe 1. As explained above, the prosecutor argued that count 12 was based on defendant's act of taking Jane Doe 1 from the Jeep to the van to rape her and count 13 was based on raping Jane Doe 1 inside the van after he kidnapped her. The vehicle theft occurred when defendant stole the keys to the van from the dealership. In sentencing defendant to consecutive terms for counts 12 and 13, the court stated, "The court finds this is a separate occasion. The defendant moved the victim from the Jeep to a stolen van that he stole. He drove her around in this van, and this was also a separate place and occasion."

36

Substantial evidence supports the court's finding that the criminal conduct underlying counts 12 and 13 is divisible. The kidnap and rape were separated in space and time and the trial court could reasonably conclude that defendant's objectives for each offense were different. The kidnapping occurred when defendant moved Doe 1 from the Jeep to the van with the intent to commit the rape, as well as to escape detection. The rape itself occurred after defendant drove to a new location and was committed for the purpose of sexual gratification. Importantly, defendant had considerable opportunity to reflect between the time he initiated the kidnap and when he ultimately committed the rape.

Similarly, substantial evidence supports the court's imposition of separate punishment on the vehicle theft and the aggravated kidnapping offenses because the offenses were divisible in time, defendant had time to reflect between the offenses, and the objectives of the offenses were entirely different. According to Doe's testimony, defendant stole the keys to the van before forcing her into it. There was ample time for defendant to have abandoned his intent to kidnap Doe. Separate punishment under these circumstances ensures defendant's punishment is commensurate with his culpability.

*Jane Doe 2*

Defendant contends that his sentence for count 20, kidnapping Jane Doe 2 to commit a sex crime, should be stayed because it was part of an indivisible course of conduct with counts 21 and 22, forcible sodomy and oral copulation of Jane Doe 2. As discussed above, the prosecutor argued that count 20 referred to "when the defendant took [Jane Doe 2] into the house, and he took her into the bathroom, and he raped her and sodomized her and

37

forced her to orally copulate him." Counts 21 and 22 referred to the offenses committed inside the bathroom.

In sentencing defendant to consecutive terms on counts 21 and 22 the court found that "between the acts, [defendant] had the time to reflect and stop his assaults but nonetheless chose to continue." Although the court did not make an express finding regarding the kidnap charge and the completed sex offenses, as it did with Jane Doe 1, implicit in the court's imposition of a consecutive term is the determination that the aggravated kidnapping and the sexual assaults were divisible. Defendant's objective in following Jane Doe 2 to the bathroom was twofold: to sexually assault her, and to prevent her from escaping. Once in the bathroom, defendant had an opportunity to reflect before he committed the subsequent sexual assaults. Accordingly, section 654 does not apply and the trial court was correct to impose separate sentences for the kidnapping and sexual assaults.

## C. *Cruel and Unusual Punishment*

Defendant contends that imposition of seven life-without-the-possibility-of-parole sentences for crimes committed against Jane Doe 1 and the two 25-year-to-life terms imposed for crimes committed against Jane Doe 2 amounts to cruel and unusual punishment under the Eighth Amendment.

The Eighth Amendment's ban on cruel and unusual punishment " ' "forbids only extreme sentences that are 'grossly disproportionate' to the crime." ' " (*In re Coley* (2012) 55 Cal.4th 524, 542.) Outside the death penalty context, " 'successful challenges to the proportionality of particular sentences have been exceedingly rare.' " (*Ewing v. California* (2003) 538 U.S. 11, 21.) "[T]he fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is 'properly left within the

province of legislatures, not courts.' " (*Harmelin v. Michigan* (1991) 501 U.S. 975, 998.) When faced with a claim that a particular sentence constitutes cruel and unusual punishment, "[r]eviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." (*Solem v. Helm* (1983) 463 U.S. 277, 290.)

The sentences challenged by defendant were imposed under section 667.61, California's "One Strike" law, which provides an LWOP sentence for specific sex crimes against minors committed under one or more aggravating circumstances, and a 25-year-to-life sentence for specific sex crimes against other victims under aggravating circumstances. (§ 667.61, subds. (j)(1), (j)(a).) In *People v. Reyes* (2016) 246 Cal.App.4th 62, the court upheld an LWOP sentence imposed under section 667.61, subdivision (l) against an Eighth Amendment challenge in a case involving a sex offense against a minor during the commission of a first degree burglary. The court acknowledged that the punishment was "very severe," but that the offenses not only occurred during the commission of a residential burglary, but "against a minor, society's most vulnerable victim," whom the Legislature had seen worthy of affording additional protection against sexual assault. (*Id.* at p. 85.) The court "accept[ed] and defer[ed] to the California Legislature's judgment" that sex crimes against minors committed under circumstances that posed a heightened danger to human life—there, burglary—"are very grave offenses that warrant severe punishment." (*Ibid*.) While imposition of six consecutive LWOP terms is largely unnecessary, it is not unconstitutional. (See *People v. Garnica* (1994) 29 Cal.App.4th 1558, 1564 [upholding but noting "little practical impact from imposition of multiple . . . LWOP verdicts."].)

Defendant also contends that "LWOP based solely on prosecution charging discretion is cruel and unusual punishment." As the Attorney General notes, this argument has been soundly rejected by our Supreme Court. (See *People v. Bemore* (2000) 22 Cal.4th 809, 858 ["Prosecutorial discretion to select those eligible cases in which the death penalty will actually be sought does not render the death penalty law arbitrary and capricious or otherwise offend cruel and unusual punishment principles under the federal Constitution."].)

Finally, defendant contends that imposition of consecutive sentences based on multiple victims (§ 667.61, subd. (i)) constituted "double use of the multiple victim circumstance," resulting in the cruel and unusual punishment of imposing five consecutive LWOP sentences on him. We disagree. The rule prohibiting a fact that is an element of the crime from being used to impose consecutive sentences (Cal. Rules of Court, rule 4.425(b)(3)) does not apply to the One Strike law, which is an alternative sentencing scheme. (*People v. Jenkins* (1995) 10 Cal.4th 234, 252, fn. 10; *People v. Cressy* (1996) 47 Cal.App.4th 981, 991.)

### 9. The Restitution Fine

The court ordered defendant to pay a $7,500 restitution fine (§ 1202.4, subd. (b)). Citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendant contends this fine should be reversed because the trial court failed to make a finding of defendant's ability to pay.[14] As the Attorney General argues, defendant forfeited this challenge on appeal because he failed to raise his inability to pay in the trial court. (See *People v. Nelson* (2011) 51 Cal.4th 198,

---

[14] Defendant also challenges imposition of a court conviction fine and an operations assessment fee without a finding on his ability to pay. The abstract of judgment indicates that these fees were waived and the Attorney General does not assert otherwise.

227 [Section 1202.4, subdivision (d) calls for "the court to consider a defendant's ability to pay in setting a restitution fine [in excess of the minimum], and defendant could have objected at the time if he believed inadequate consideration was being given to this factor."].) Here, the probation department recommended a restitution fine that well exceeded the statutory minimum under section 1202.4, subdivision (b),[15] a recommendation that the trial court adopted without objection. If defendant believed he was unable to pay a restitution fine of this magnitude, it was incumbent on him to object at sentencing and request an ability-to-pay hearing, and the failure to do so resulted in a forfeiture of the claim for purposes of appellate review. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032-1033; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154.)

---

[15] Section 1202.4 provides in relevant part: "(b) In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000). . . . [¶] (2) In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted. [¶] (c) The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)."

### 10. In Camera Review

Defendant requests that this court review the sealed transcripts of in camera hearings conducted on August 2, 2017 and September 27, 2017, to "determine whether the court's in camera rulings violated any of defendant's statutory or constitutional rights or impact any of the issues raised on appeal. We have reviewed the transcript of the in camera hearing conducted on August 2 in which the court discussed defense counsel's request for a continuance based, in part, on recently discovered DNA evidence. We find no violation of defendant's rights or relevance to the issues raised on appeal. We have also reviewed the transcript of the in camera hearing conducted on September 27 in which the court discussed defense counsel's subpoena of Jane Doe 1's medical records. We find no violation of defendant's rights or relevance to the issues raised on appeal.

## Disposition

The judgment is affirmed. The abstract of judgment shall be modified to reflect imposition of a concurrent sentence of 25 years to life in prison on count 3, a consecutive sentence of 25 years to life in prison on count 23, a consecutive sentence of 14 years on count 18 plus four years for the associated firearm enhancement (Pen. Code, § 12022.5), and a one-year sentence on count 17.


POLLAK, P. J.


WE CONCUR:

STREETER, J.
BROWN, J.